IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 04-cv-01002-MSK-CBS

DONJA VAUGHN,

      Plaintiff,

v.

SIMMS RHEA,
JOE OLT,
JOEL STEVENSON, and
GARY SHOUN,

      Defendants.

---

## OPINION AND ORDER GRANTING, IN PART, SUMMARY JUDGMENT MOTIONS; AND DENYING MOTION TO AMEND

---

**THIS MATTER** comes before the Court pursuant to the Plaintiff's Motion for Leave to File an Amended Complaint (**# 126**), and Defendant Olt's response (**# 143**); the Plaintiff's Motion for Partial Summary Judgment (**# 128**), Defendant Rhea's response (**# 144**), Defendants Stevenson, Shoun, and Olt's response (**# 145**), two "Supplements" by the Plaintiff to her motion (**# 168, 173**), and the Defendants' response (**# 176**) to the Plaintiff's Second Supplement; Defendants Stevenson and Shoun's Motion to Dismiss (**# 129**), the Plaintiff's response (**# 147**), and Defendants Stevenson and Shoun's reply (**# 156**); Defendant Olt's Motion to Seal (**# 130**) an exhibit filed in conjunction with one of his motions; Defendant Stevenson and Shoun's Motion for Summary Judgment (**# 132**), the Plaintiff's response (**# 148**), Defendants Stevenson and Shoun's

reply (**# 159**), and the Plaintiff's "Revised Response" (**# 163**); Defendants Stevenson and Shoun's

Motion to Seal (**# 134**) an exhibit filed in conjunction with one of their motions; Defendant Olt's

Motion for Summary Judgment (**# 135**), the Plaintiff's response (**# 149**), and Defendant Olt's

reply (**# 158**); Defendant Rhea's Motion to Seal (**# 137**) an exhibit filed in conjunction with one of

her motions; Defendant Rhea's Motion for Partial Summary Judgment (**# 138**)[1], the Plaintiff's

response (**# 150**), and Defendant Rhea's reply (**# 162**); and Defendant Rhea's Motion to Strike (**#**

**177**) the Plaintiff's Second Supplement (**# 173**) to her Motion for Summary Judgment, and the

Plaintiff's response[2] (**# 191**).[3]

## BACKGROUND

### Initial Complaint and Defendant Rhea's Counterclaim

According to the original Complaint (**# 1**), filed on May 17, 2004, the Plaintiff lawfully

obtained a horse named "Edes" from Defendant Rhea in June 1994. In July 2001, Edes gave birth

to a foal, "Elgin." In April 2002, Robert and Margaret Krehbiel, non-parties to this action, filed

an agister's lien against Edes and Elgin. In May 2002, Montezuma County Court Judge

Christopher LeRoi deemed the Krehbiel's lien null and void, and in December 2002, a District

[1]The Court's docket contains an entry at Docket # 161 that is duplicative of this motion.

[2]There also remains pending a motion by the Plaintiff for an extension of time (**# 181**) to file her response to Rhea's motion to strike, and Rhea filed a response (**# 183**) to that request for extension. Because the Court grants the motion to strike, it will deny the Plaintiff's motion for extension of time as moot.

[3]The Court's docket reflects that Defendants Shoun and Stevenson's Unopposed Motion to Extend Date for Filing Dispositive Motions (**# 108**) remains pending. It appears that this filing was superseded the following day by the same Defendants' Amended Motion for Extension of Time to File Dispositive Motions (**# 109**). The latter motion was denied without prejudice (**# 113**). Accordingly, the Court directs that the Clerk of the Court modify Docket entry # 113 to reflect the denial of both Docket # 109 <u>and</u> Docket # 108.

Court Judge, presumably also in Montezuma County, found that the Plaintiff was the legal owner of Elgin.[4]  There is a factual lacuna at this point in the Complaint, as the next allegation states that "Plaintiff strenuously objected to the conduct of Defendants Olt, Stevenson, Connor, and Shoun in conspiring to bring criminal actions against the Plaintiff for what were essentially civil claims. . ."  *Docket* # 1, ¶ 14.  The remainder of the factual allegations in the Complaint become difficult to comprehend, as they do not adhere to any apparent scheme of classification by chronology or subject matter.[5]

     As best the Court can comprehend from selected portions of the Complaint, at some time prior to June 2002, Edes and Elgin were somehow seized from the Plaintiff, apparently incident to unspecified criminal charges filed against the Plaintiff.[6]  *See Docket* # 1, ¶ 14, 15, 19.  On June 18, 2002, Defendant Olt, after consultation with the other Defendants, released Edes and Elgin to Defendant Rhea.[7]  No hearing was held prior to Olt's actions.  The criminal charges against the Plaintiff were eventually dismissed in 2003, and the Plaintiff attempted to regain possession of the

-------------------

[4]The nature of the proceeding resulting in this determination is not clear from the Complaint.

[5]The Court notes that the Complaint purports to have been filed *pro se*, but the Plaintiff's current counsel has acknowledged ghost-writing the Plaintiff's pleadings in a related matter, *see Vaughn v. Rhea,* D.C. Colo. case no. 04-cv-01358-MSK-CBS, *docket* # 79, and the Defendants contend that the Plaintiff's counsel has made a similar admission during discovery here.

[6]The parties' evidentiary submissions reveal that the Plaintiff was charged criminally with two counts of perjury, and one count each of theft, false reporting, and cruelty to animals.  *See Docket* # 138, Ex. A16.

[7]The Complaint notes that this was done notwithstanding the May 2002 order of Judge LeRoi deeming the Krehbiels' lien void, but does not explain the connection, if any, between the Krehbiels' lien and the release of the horses to Defendant Rhea.

horses, but the "Defendants" – presumably referring to Defendant Rhea – "refused to return the horses."

The Complaint alleges three causes of action.  The first claim is captioned "retaliation for complaining about official misconduct," and alleges that "Defendants conspired together to violate court orders not to release the horses in retaliation for Plaintiff's complaints, communication and filing motions regarding their official misconduct and/or working together to criminally prosecute what were reasonably only civil claims, in violation of the First Amendment." The precise contours of this claim are murky – the quoted text does not adequately advise whether the Plaintiff is alleging that it is the release of the horses or the prosecution of criminal charges is the alleged retaliatory act.  If it is the former, this claim would appear to effectively duplicate the second claim, which asserts that the release of the horses deprived the Plaintiff of her property without Due Process; in a Due Process claim, the motives of the state actor, retaliatory or otherwise, are irrelevant.  If, instead, the Plaintiff is complaining that criminal charges were brought against her because of her First Amendment speech,[8] such a claim is essentially one for malicious prosecution under 42 U.S.C. § 1983.  *See e.g. Hewitt v. Rice*, 119 P.3d 541, 544 (Colo. App. 2004) (elements of claim of malicious prosecution are: (i) a defendant contributed to bringing a civil or criminal proceedings against the plaintiff; (ii) the proceeding was resolved in favor of the plaintiff; (iii) there was no probable cause for the proceeding; (iv) the defendant acted

---

[8]Even the most charitable reading of the Complaint reveals only one allegation that the Plaintiff exercised her First Amendment rights to criticize the Defendants, and that exercise appeared to be in response to the criminal charges that were preferred against her. *See Docket #* 1, ¶ 14.  There are no factual allegations in the Complaint alleging that the Plaintiff criticized any of the Defendants prior to being criminally charged, and thus, it is difficult to discern how the criminal charges could not possibly have been filed as retaliation for such criticism.

with malice; and (v) the plaintiff incurred damages).  In order to avoid redundancy, the Court will

assume, for purposes of the pending motions, that the first claim is one for malicious prosecution

only.  The second claim is captioned "violation of due process," and contends that the Defendants

deprived the Plaintiff of her property – the horses – without a hearing or notice, in violation of the

14th Amendment.  The third claim, captioned "conversion and replevin," contends that Defendants

Stevenson and Rhea converted the Plaintiff's horses, and seeks, among other remedies, an order

directing the return of those horses.

On August 16, 2004, Defendant Rhea filed an Answer and Counterclaim **(# 9)**.  In the

Counterclaim, Defendant Rhea alleges that in June 1994, she entered into an agreement with the

Plaintiff by which the Plaintiff would board, feed, and maintain Edes,[9] in exchange for the Plaintiff

receiving the proceeds from certain foals produced by Edes.  In April 2002, Defendant Rhea

learned that Edes had been impounded by the Colorado State Brand Commission, and transferred

to the Krehbiels, awaiting auction to satisfy the Krehbiels' agister's lien.  Defendant Rhea

commenced an action against the Plaintiff in Montezuma County Court, seeking to have Edes and

Elgin[10] released to her.  On June 17, 2002, Defendant Olt released Edes and Elgin to Defendant

Rhea, and Defendant Rhea then paid the Krehbiels in satisfaction of their lien against the horses.

Defendant Rhea asserts four claims against the Plaintiff: (i) breach of contract, in that the Plaintiff

---

[9]The Counterclaim refers to a horse named "Magyar Edes 'Keri' a/k/a Thomboy," which
Defendant Rhea thereafter refers to as "Keri."  It would appear that this is the same horse
described by the Plaintiff as Edes, and for purposes of continuity, the Court will refer to the horse
as Edes throughout this opinion.

[10]Defendant Rhea's counterclaim refers to the foal as "Toby."  Based on the totality of the
parties submissions, it appears that "Toby" is the same horse as Elgin, and will hereafter be
referred to as Elgin throughout this opinion.

violated the 1994 agreement by failing to properly board, maintain, and return Edes; (ii) negligent

misrepresentation, in that the Plaintiff gave false information to Defendant Rhea about her care of

the horse, and gave false information to others about her ownership of the horse; (iii) negligence,

in that the Plaintiff failed to exercise reasonable care in caring for and handling Edes and Toby;

and (iv) a statutory violation of C.R.S. § 35-54-101 *et seq.*, in that Defendant Rhea is the "rightful

owner" of Edes and Toby, and that Plaintiff "encumbered and/or attempted to sell" the horses in

violation of the statute.[11]

### Plaintiff's Motion to Amend

On November 24, 2004, Magistrate Judge Shaffer conducted a Scheduling Conference (**#

42**) and issued a Scheduling Order (**# 44**), setting a deadline of January 31, 2005 for joinder of

parties and amendment of pleadings.  Although the Magistrate Judge subsequently extended (**#

104**) some of the deadlines in the Scheduling Order, no party ever sought nor obtained an

extension of this deadline.

On December 14, 2005, nearly a full year after the deadline for amendment of pleadings

had passed, the Plaintiff filed the instant Motion for Leave to File an Amended Complaint (**# 126**).

In that motion, the Plaintiff states that on October 6, 2005, her counsel discovered that, at some

point prior to the relevant events in this case, the Plaintiff had purported to convey Edes and Elgin

to a trust.  The Plaintiff requested leave to name the trust as an additional Plaintiff, and to amend

---

[11]Generally, the statute requires that any sale of livestock be accompanied by a bill of sale, C.R.S. § 35-54-101, and establishes a criminal penalty for failure to do so.  C.R.S. § 35-54-102. Precisely how the Plaintiff allegedly violated the statute, and the basis upon which Defendant Rhea asserts a private right of action is not clear from the Counterclaim.

certain factual allegations in the Complaint.[12] Only Defendant Olt filed a response to the Motion to Amend, challenging it as untimely and asserting that the Plaintiff's conduct in asserting her own individual right to ownership of the horses reflects bad faith.

### Plaintiff's Motion for Summary Judgment

On December 16, 2005, the Plaintiff filed a Motion for Partial Summary Judgment (**#128**). The Court notes that this document does not comply with its Practice Standards in two respects: (i) the document is 42 pages long, and the Plaintiff neither sought nor obtained leave to exceed the Court's 20-page limit on summary judgment motions; and (ii) the document does not adhere to the required format for summary judgment motions.[13]  In addition, the motion is incomprehensible.  The Plaintiff does not clearly delineate the claims upon which she seeks summary judgment or the Defendants as to whom that judgment is sought.  She begins the motion with a 17-page listing of "Facts," which are subdivided not by claim or in any other useful manner, but by arbitrary categories selected by the Plaintiff.  *See e.g. Docket* # 128 at 1-17 (categories

---

[12]The text of the motion describes certain paragraphs of the Complaint that the Plaintiff wished to amend, and the text that would be added or substituted in those paragraphs.  However, the Plaintiff also attached a proposed Amended Complaint that differed, sometimes starkly, from both the original Complaint and the description of the proposed amendment in the text of the Motion to Amend.  *Compare*, *e.g.*, *Docket* # 1, ¶ 11 (describing the Krehbiels' lien) *and Docket* # 126, p. 2-3 (proposing modification of this paragraph by adding that the lien was filed "at the advice and with assistance of Defendant Shoun & Stevenson") *with Proposed Amended Complaint*, ¶ 11 (describing creation of the trust) *with Proposed Amended Complaint*, ¶ 13 (describing the Krehbiels' lien with text stating it was filed "at the advice and with assistance of Defendants Shoun, <u>Conner</u> and Stevenson") (emphasis added).  The Court is unclear as to precisely what text an Amended Complaint would actually contain.

[13]At the time the Plaintiff filed the motion, an earlier version of the Court's present Practice Standards was in effect.  However, as is relevant here, the language in the prior version is effectively unchanged in the present practice standards.  *See* MSK Civ. Practice Standard V.H.3.a ("Absent prior leave of court, no motion, opening brief, response, or response brief shall exceed twenty pages"); MSK Civ. Practice Standard V.H.3.b (format for summary judgment motions).

include "Conversion," "Agister's Lien," "Hold on Title," "Krehbiel Had Insufficient Funds to

Feed," "Simms Rhea Told to Work Legally for Possession," and "Departure From Normal

Procedures"). The Plaintiff insists on confusingly referring to individuals by their initials, rather

than their names. The Plaintiff sets forth facts in extended paragraphs that appear to span

numerous subjects, and often devolve in a confusing morass of pronouns making it difficult to

determine which individual is being referred to. *See e.g. Docket* # 128 at 11-12. The second

portion of the motion is a 12-page section entitled "Law." This section is also arbitrarily

subdivided into random categories, and consists primarily of single-sentence citations to holdings

of various cases, many of which are clearly inapplicable or of questionable significance. The

Plaintiff finally begins to analyze the facts of the case in light of the law beginning at page 29 of

the motion, in a section entitled "Conclusion." Like the factual recitation, the analysis occurs in

randomly categorized, single-paragraph chunks, without a clear indication as to what claim is

being analyzed, nor against which Defendant. The motion concludes with a four-page section

entitled "Summary," which states "There facts are undisputed," and proceeds to list 17 factual

averments, most of which are not supported by citation to the record.

Defendant Rhea filed a response **(# 143)** to the Plaintiff's summary judgment motion,

noting its noncompliance with the Court's Practice Standards, disputing the Plaintiff's final

recitation of "undisputed facts" and offering citation in support, and contending that the Plaintiff

had failed to demonstrate her entitlement to summary judgment. Defendants Shoun and

Stevenson filed a similar response **(# 144)**.

The Plaintiff did not file a reply brief. Rather, on February 15, 2006, she filed a

"Supplement/Amendment" **(# 168)** to her motion for summary judgment, describing documents

8

produced by Defendant Olt in January 2006 that "reveal details of the conspiracy over a 3½

period (sic)." The "Supplement" asserts certain facts that the newly-produced documents

allegedly establish, but does not cite to any particular document in support of any particular

assertion. On March 7, 2006, the Plaintiff filed a "Second Supplement" (**# 173**) to her motion.

This document appears to be essentially a reply brief, but offers no explanation as to why it was

filed approximately a month after the deadline for filing a reply brief had passed. Defendant Rhea

has moved to strike (**# 177**) the Second Supplement, on the grounds of untimeliness. The Plaintiff

filed a response (**# 191**) to the motion to strike, asserting that the Second Supplement was not an

attempt to file an untimely reply brief, but rather "simply supplement[ ] the record over 4 months

before the trial date so the court would have all information needed to rule on dispositive

motions."[14] In addition, the Defendants jointly filed a "response" (**# 176**) to the Second

Supplement, challenging its timeliness and sufficiency.

### Defendants Shoun and Stevenson's Motion to Dismiss

On December 19, 2005, Defendants Shoun and Stevenson moved to dismiss (**# 129**) the

claims of conversion and replevin against them, contending that the Court lacks jurisdiction over

the claims; that the claims are barred by Colorado's one-year statute of limitations on claims

against brand inspectors, C.R.S. § 13-80-103(1)(c); that the claims are barred by the Plaintiff's

---

[14] The Court finds the Plaintiff's semantic labels to be unavailing. The purpose of traditional opening, response, and reply briefs is to supply the Court with "all information needed to rule." A supplement is appropriate, if at all, only to apprise the Court of a change in circumstances that occurs <u>after</u> a brief is filed. *Accord* Fed. R. Civ. P. 15(d) (permitting "supplemental" pleadings "setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented"). Because the Plaintiff's Second Supplement does not purport to describe events occurring after the filing of the Plaintiff's initial motion, it is improper and Defendant Rhea's Motion to Strike is granted. The Court will disregard the Second Supplement in its entirety.

failure to give notice of them under the Colorado Governmental Immunity Act, C.R.S. § 24-10-109(1); and that the Plaintiff has failed to follow the procedures in C.R.C.P. 104 in order to obtain return of the horses.  In response (**# 147**), the Plaintiff contends that the two-year statute of limitations applicable to § 1983 actions applies, notwithstanding Defendants Shoun and Stevenson's status as brand inspectors; and that the Colorado Governmental Immunity Act does not apply to "federal civil rights claims."  In reply (**# 156**), Defendants Shoun and Stevenson contend that the § 1983 statute of limitations or limitations on state immunities do not apply to the Plaintiff's state-law claims for conversion and replevin.

### **Defendants Shoun and Stevenson's Motion for Summary Judgment**

Simultaneously with their Motion to Dismiss, Defendants Shoun and Stevenson filed a Motion for Summary Judgment (**# 132**), alleging that the Plaintiff's Due Process claims are barred by absolute prosecutorial immunity.  Specifically, they contend that the horses were seized as evidence to be used in a criminal prosecution of the Plaintiff, and that the horses were released to Defendant Rhea to preserve that evidence.  In the alternative, Defendants Shoun and Stevenson contend that they are entitled to qualified immunity, in that they believed that, by releasing the horses to Defendant Rhea, they were carrying out a valid prosecutorial directive from Defendant Olt, the Montezuma County District Attorney.  Finally, Defendants Shoun and Stevenson challenge the Plaintiff's standing to assert any claims, insofar as the trust, not the Plaintiff, was the lawful owner of the horses at all times.

The Plaintiff filed a timely response (**# 148**), arguing that her Motion to Amend cures any standing deficiency by naming the trust as a party; that the release of the horses to Defendant Rhea was not prosecutorial in nature, and thus, Defendants Shoun and Stevenson are not entitled

to absolute immunity; and that Defendants Shoun and Stevenson are not entitled to qualified immunity because they knew that the release of the horses violated a court order issued by Judge LeRoi that the horses were not to be moved.  Notably, nowhere in the Plaintiff's response does she cite to any evidence disputing Defendants Shoun and Stevenson's factual assertions.[15]

In their reply (**# 159**), Defendants Shoun and Stevenson distinguish the law cited by the Plaintiff for the proposition that their release of the horses was an administrative, rather than prosecutorial, decision, and contend that the Plaintiff's refutation of their qualified immunity defense is misplaced.  Defendants Shoun and Stevenson do not, however, address the effect of their alleged knowledge of Judge LeRoi's order that the horses not be moved.

### Defendant Olt's Motion for Summary Judgment

On December 19, 2005, Defendant Olt moved (**# 135**) for summary judgment, alleging the same basic arguments as Defendants Shoun and Stevenson.  The Plaintiff's response (**# 149**) is substantially the same as her response to Defendants Shoun and Stevenson's motion for summary judgment, and Defendant Olt's reply (**# 158**) is substantively similar to Defendants Shoun and Stevenson's reply.

### Defendant Rhea's Motion for Parital Summary Judgment

On December 19, 2005, Defendant Rhea moved for partial summary judgment (**# 138**), seeking judgment in her favor on the Plaintiff's claim for conversion and on Defendant Rhea's

---

[15]On the same day as Defendants Shoun and Stevenson's reply brief, the Plaintiff filed a "Revised Response" (**# 163**) to their summary judgment motion.  Although the Plaintiff never sought leave to submit a revised response, nor explained what revisions were being made, the Court's comparison of the two responses reveals that the revised response includes a full page of text at page 7 that was apparently omitted from the Plaintiff's original response.  Defendants Shoun and Stevenson have not objected to the Plaintiff's revision of her response to include the omitted page, and thus, the Court will consider the Revised Response in lieu of the original.

counterclaim of breach of contract.  Defendant Rhea's motion sets forth the facts and evidence

supporting her counterclaim of breach of contract, and contends that the Plaintiff is not the legal

owner of Edes or Elgin, thus defeating the Plaintiff's conversion claim.

In response (**# 150**), the Plaintiff contends that the conversion claim may lie because she

had possession of the horses, if not outright ownership.  In addition, the Plaintiff contends that

Defendant Rhea engaged in a conspiracy with the other Defendants and the Krehbiels to obtain

the horses, although the relevance of this line of argument to Defendant Rhea's motion is unclear.

In response to Defendant Rhea's request for summary judgment on her counterclaim of breach of

contract, the Plaintiff denies that any of her actions constituted a breach of the contract, although

many of these assertions are either unsupported by citation to evidence in the record, or are not

directly responsive to the facts asserted in Defendant Rhea's motion.

### Motions to Seal

Each of the Defendants have moved (**# 130, 134, 137**) to have portions (or, in the case of

Defendant Rhea, the entirety) of their motions for summary judgment sealed.  Each of these

motions is premised upon a June 29, 2005 Protective Order (**# 87**) issued by Magistrate Judge

Shaffer, requiring that any use of the Plaintiff's deposition be sealed.

### ANALYSIS

### A.  Motion for Leave to Amend

Leave to amend a pleading shall be "freely granted" absent a showing of  "undue delay,

bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

previous amendments, undue prejudice to the opposing party by virtue of allowance of the

amendment, or futility of the amendment." *Beerheide v. Zavaras*, 997 F.Supp. 1405, 1409 (D.

Colo. 1998), *citing Foman v. Davis*, 371 U.S. 178, 182 (1962).  An amendment can be denied on the grounds of futility if the amended pleading itself would be subject to dismissal.  *Jefferson County School Dist. v. Moody's Investor Services, Inc.*, 175 F.3d 848, 859 (10th Cir. 1999); *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir.1999).

The Plaintiff's request to amend comes nearly a year after the expiration of Magistrate Judge Shaffer's deadline for amendment of pleadings.  The Plaintiff has neither previously sought or obtained an extension of this deadline, nor shown good cause in the instant motion to permit such an extension.  This alone would constitute a sufficient basis to deny the motion for undue delay.   Although the Plaintiff might contend that the cause for the amendment – her discovery of the conveyance of the horses to the trust – did not arise until October 2005, the Court finds that this does not constitute sufficient cause to overlook the untimeliness of the motion.  The creation of the trust and the Plaintiff's conveyance of the horses to it are matters that were or should have been known to the Plaintiff from the very commencement of this action.  Indeed, there is undisputed evidence that the Plaintiff created the trust and conveyed the horses into it on January 1, 2002, *Docket* # 138, Ex. A6, only a few months prior to filing the instant action.  Thus, the Plaintiff can not rely on her sudden "recollection" of the existence of the trust in October 2005 to permit her long-tardy motion to amend.

Moreover, permitting the Plaintiff to amend the Complaint at this late date would be prejudicial to the Defendants.  The Plaintiff seeks to essentially substitute the trust as the real party in interest on most of the claims.  Doing so now would render much of the discovery concerning the nature and extent of the Plaintiff's claims to be useless.  For example, much of the discovery conducted on the Plaintiff's claims of conversion and replevin would be pointless if the

Plaintiff were to now assert that it is the trust, not the Plaintiff, that was the owner of the horses and the entity damaged by the alleged conversion.  Likewise, discovery as to the damages sustained by the Plaintiff on the Due Process claim would be irrelevant, as it would be the trust, not the Plaintiff, who was damaged by such a violation.  The prejudice to the Defendants is magnified by the fact that the culpability for the mis-designation of the parties rests entirely on the Plaintiff.  Thus, undue prejudice to the Defendants stands as an independently sufficient basis to deny leave to amend.[16]

Accordingly, the Plaintiff's Motion to Amend is denied.  The original Complaint remains the operative pleading in this case.

**B.  Defendant Stevenson's Motion to Dismiss**

Having identified the operative pleading, the Court next turns to the challenges by Defendant Stevenson to the Court's subject-matter jurisdiction.[17]  Specifically, Defendant Stevenson challenges the Court's jurisdiction to hear the conversion and replevin claims against him, as well as challenges the timeliness of those claims.

---

[16]Although the Defendants have not urged it, the Court also has doubts as to whether an amendment of the Complaint to add the trust could survive a motion to dismiss on limitations grounds.  Although the Federal Rules liberally provide for relation back of amendments, there is some reason to believe that, in circumstances such as this one, it would not be appropriate to deem claims by the trust to relate back to the filing date of the Complaint.  *See e.g. Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301, 1308-10 (D.C. Cir. 1982) (refusing relation back where plaintiff sought to amend complaint to assert claims by corporation wholly-owned by plaintiff, even though corporation's claims arose out of same set of facts as originally asserted by plaintiff).  If relation back were not permitted, claims by the trust asserted in November 2005 would be untimely to challenge events occurring in June 2002.

[17]The Motion to Dismiss was filed on behalf of both Defendant Shoun and Defendant Stevenson.   However, the Complaint alleges the conversion and replevin claim against Defendant Stevenson only, and the Court will confine its analysis of that motion to Defendant Stevenson.

It is undisputed that, as a brand inspector, Defendant Stevenson is a law enforcement officer under Colorado law. *See Delta Sales Yard v. Patten*, 892 P.2d 297, 301 (Colo. 1995).  It is also undisputed that, under C.R.S. § 13-80-103(1)(c), civil actions brought against "any . . . law enforcement authority" are governed by a one-year statute of limitations.  The Plaintiff contends that the Court should apply the two-year statute that applies to § 1983 actions, *see Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006), but this argument misperceives the nature of the conversion and replevin claims.  Although supplemental jurisdiction, 28 U.S.C. § 1367, permits the Plaintiff to assert state law claims alongside her §1983 claims, the Court applies state law, including state statutes of limitation, to claims that arise purely under state law.  The claims for conversion and replevin arise solely under state law, and thus, those claims – at least as asserted against Defendant Stevenson – are subject to a one-year statute of limitations.

Because the Plaintiff commenced this action more than one year later than the events at issue, the conversion and replevin claims against Defendant Stevenson are dismissed, as untimely.  The Court need not reach the remaining arguments in the motion.

### C.  Summary Judgment Motions

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law determines what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is no genuine dispute as to any material fact, no trial is required because the court applies the law to the undisputed facts and enters judgment. If there is a genuine dispute as to material fact, a trial is required.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## A.  Defendants Shoun, Stevenson, and Olt

Defendants Shoun, Stevenson, and Olt's motions for summary judgment raise the same three arguments: (i) that the Plaintiff lacks standing based on her lack of ownership of the horses; (ii) that the Defendants are entitled to absolute prosecutorial immunity; and (iii) that the Defendants are entitled to qualified immunity.  With regard to the standing and qualified immunity claims, the burden is on the Plaintiff to demonstrate that she has standing and that qualified immunity is not appropriate.  However, the Defendants bear the burden of establishing that they are entitled to absolute immunity.  *Perez v. Ellington,* 421 F.3d 1128, 1133 (10th Cir. 2005).

### (i)     Standing

Before turning to the question of standing, it is necessary to first identify those claims by the Plaintiff that would be compromised by her alleged lack of standing.  The first claim alleges that the Defendants maliciously prosecuted her.  This claim does not turn on the Plaintiff's ownership or possession of Edes and Elgin, and thus, the Plaintiff's standing to assert this claim is not affected by the issue of ownership of the horses.  The second claim alleges a deprivation of property without Due Process.  A person need not hold title to property before he or she can assert a Due Process claim based on the deprivation of that property; all that is necessary is that the person had a current possessory interest.  *See Abbot v. Latshaw*, 164 F.3d 141, 146 & n. 2 (3d Cir. 1998) ("deprivation of a possessory interest alone invokes the right to procedural due process").  Thus, the question of who held title to Edes and Elgin is not germane to the Due Process claim, so long as the Plaintiff had a present right to possess the horses at the time Defendants Stevenson, Shoun, and Olt transferred them to Defendant Rhea.  Likewise, under Colorado law, the tort of conversion requires that the party asserting it have "title or right of

17

immediate possession to the property." *Pierce v. Ackerman*, 488 P.2d 1118, 1119 (Colo. App. 1971) (emphasis added). Thus, the Plaintiff can maintain a claim for conversion, even if her rights in Edes and Elgin were merely possessory.

The replevin claim does not appear to properly lie as against Defendants Shoun, Stevenson, or Olt. A replevin claim is one which inquires into the plaintiff's right to possess an item or property, the means by which the defendant came into possession of that property, and whether the defendants retention of the property comes against the rights of the plaintiff. *City and County of Denver v. Desert Truck Sales, Inc.,* 837 P.2d 759, 764 (Colo. 1992). Thus, a replevin action can lie only as between the Plaintiff and the person actually in possession of Edes and Elgin. The Plaintiff alleges that the Defendants conspired together to deliver the horses to Defendant Rhea, but does not allege that Defendants Shoun, Stevenson, or Olt are currently in actual possession of the horses. Thus, they are not proper defendants in a replevin claim.

Accordingly, the Court need not resolve the standing issue for purposes of the claims against Defendants Shoun, Stevenson, and Olt. Notwithstanding her conveyance of horses to the trust, the Plaintiff has sufficient standing to assert her federal claims against Defendants Olt, Shoun, and Stevenson.

(ii)     Absolute Immunity

In *Imbler v. Pachtman*, 424 U.S. 409, 410 (1976), the United States Supreme Court recognized that state actors acting within a prosecutorial capacity are absolutely immune from liability for those actions. At the same time, the Court recognized that such immunity should not extend to "those aspects of the prosecutor's responsibility that case him in the role of an administrator or investigative officer rather than that of advocate." *Id.* at 430-31. In determining

whether an act is prosecutorial or administrative in nature, courts apply a functional approach, examining that nature of the function performed, not the identity of the person performing it. *Perez*, 421 F.3d at 1133.

The parties' briefing on this issue relies significantly on *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) and *Coleman v. Turpen*, 697 F.2d 1341, 1344 (10th Cir. 1983). The Plaintiff relies heavily on *Hill*, in which the court held that a prosecutor's participation in the investigation of a charge of child abuse, and the prosecutor's recommendation that authorities remove the child from the home, were acts of an investigatory, not prosecutorial, nature, and thus, were not protected by absolute immunity. The Plaintiff analogizes Defendants Shoun, Stevenson, and Olt's removal of Edes and Elgin from her possession as analogous to the prosecutor's removal of the children in *Hill*. Similarly, in *Coleman*, the 10th Circuit refused to extend absolute immunity to prosecutors for their actions in disposing of property taken from a criminal defendant at the conclusion of trial. 697 F.2d at 1346. The court held that "in managing the post-trial disposition of seized property not used in evidence . . . [the prosecutor] was acting as an administrator, not an advocate." *Id.* By contrast, the court found that the prosecutor's retention of cash that was used as evidence in the defendant's trial was "part of his presentation of the State's case," and thus, a prosecutorial action subject to absolute immunity. *Id.* at 1344. Taken together, *Hill* and *Coleman* present relatively clear guideposts to assess the conduct of Defendants Shoun, Stevenson, and Olt in this case: absolute immunity would apply to actions that entail the gathering and preservation of evidence for trial, but would not extend to investigation of crimes prior to charges being filed, nor to the post-trial disposition of the Plaintiff's property.

The Court then turns to whether there is a genuine dispute of fact as to the circumstances surrounding Defendants Shoun, Stevenson, and Olt's transfer of the horses to Defendant Rhea on or about June 18, 2002.  As the parties with the burden of proof on this issue, Defendants Shoun, Stevenson, and Olt have carried their burden of establishing facts demonstrating a right to immunity by pointing to evidence that indicates that the horses released to Defendant Rhea were being held as evidence to be used against the Plaintiff in a criminal proceeding, *Docket* # 132, Ex. E, F (property disposition records stating "the above referenced mare and colt are currently being held for evidence"), and that Defendant Olt authorized the release of the horses to Defendant Rhea because "the horses were starving and needed to be fed and nobody could afford the feed." *Docket* # 132, Ex. C at 17.  It was Defendant Olt's understanding that Defendant Rhea "would take care of the evidence for us" and "bring them back when we needed them for trial." *Id.* at 17-18.  The criminal charges against the Plaintiff were still pending at the time the horses were released to Defendant Rhea.

The Court has carefully reviewed the Plaintiff's responses to both motions for summary judgment, but it does not appear that the Plaintiff genuinely disputes any of these facts.  The Plaintiff contends that Defendant Olt admitted that the release of the horses "was not part of the decision to prosecute Plaintiff." *Docket* # 148 at 7.  But the cited reference to Defendant Olt's deposition involved Defendant Olt answering in the negative to the question "Was the release of those horses a decision you made that was part of your decision whether to prosecute [the Plaintiff] in the first place?" *Docket* # 140, Ex. 20 at 36.  The cited question refers only to the decision "whether to prosecute . . . in the first place," but, as shown by *Coleman*, the scope of

absolute immunity extends to many matters beyond the making of the initial charging decision, such as matters relating to the collection and retention of evidence.

The Plaintiff's response contains only one other citation to evidence on this issue. The Plaintiff states that the release was "in violation of a 1994 breeding agreement and court orders denying a Motion to Release them, when the agreements and orders were in the District Attorney's file, with knowledge of an order denying their release in a companion case (Hill v. Vaughn), Exhibits 1, 2, 5 & 6." *Docket* # 148 at 6. As best the Court can understand this confusing passage, it appears that the Plaintiff is asserting that Defendant Olt should have either not released the horses at all (*i.e.* that a prior "Motion to Release" had been denied "in a companion case"), or that he should have released the horses to the Plaintiff (pursuant to the breeding agreement).

The existence of the breeding agreement – a private contract between the Plaintiff and Defendant Rhea – has no bearing on whether Defendant Olt should have released the horses, nor does it limit his discretion as to whom the horses should be released. Indeed, the fact that the horses had been seized from the Plaintiff's possession and were to be used as evidence against her strongly militates against releasing the horses back into her custody. Thus, Exhibit 1 does not aid the Plaintiff in defeating the claims of absolute immunity. Exhibit 2 is equally irrelevant. That exhibit is a motion filed by Defendant Rhea in the Plaintiff's criminal case, requesting that the court release the horses to her. *Docket* # 140, Ex. 2. The court denied that motion on the ground that Defendant Rhea had no standing to make motions in the criminal case, and that "only the District Attorney" or the Plaintiff could do so. *Id.*, Ex. 3. Nothing in this exchange warrants a conclusion that the court was restricting Defendant Olt's ability to transfer possession of the

horses; indeed, the court's ruling implies that, upon a proper motion by Defendant Olt, the horses could be released to Defendant Rhea.

Exhibits 5 and 6 are more curious.  Exhibit 5, dated December 18, 2002, appears to be an order from Judge Hansen, the judge hearing the Plaintiff's criminal case.  It reads, under a heading describing the Plaintiff's Motion for Return of Horses, "The Court finds that the District Attorney did in fact 'authorize' the release of horses, including  . . . [Edes] to Simms Rhea.  County Judge Christopher LeRoi had ordered in the County Court agister's lien case that no horse be released until final orders in that case.  While there appears to be no authority of the District Attorney to authorize release of the above horses in contravention of Judge LeRoi's Order, the remedy does not lie within the criminal action at this time.  Presence of the horses is not a requirement of proof in the criminal case."  *Docket* # 140, Ex. 5.  Exhibit 6 is the order of Judge LeRoi that Exhibit 5 refers to.  That order, issued on April 8, 2002, in what appears to be a civil case between a person named Sharon Hill and the Plaintiff, states "[the Plaintiff] is prohibited from registering the horses and from removing the horses from their current place of board in Montezuma County until further orders from this Court."

On a superficial level, Exhibit 5 could be considered evidence that contradicts the facts underlying Defendant Olt's claim that the release of the horses was an evidence-preserving act entitled to absolute immunity.  First, Exhibit 5's language suggests that, contrary to Defendant Olt's testimony, the horses were not actually evidence in the criminal case against the Plaintiff.  Moreover, the document appears to indicate that Judge Hansen did not believe that Defendant Olt had "authority . . . to authorize release of the . . . horses."

However, upon a closer inspection, Exhibit 5 suffers from several defects. First, and perhaps most importantly, it indicates that Judge Hansen misapprehended the contents of Judge LeRoi's order. Judge LeRoi's order was pinpoint specific in indicating that the <u>Plaintiff</u> (the defendant in the action before Judge LeRoi) was the only person prohibited from moving the horses. This is entirely logical, as the Plaintiff was being sued over the horses in that case, and Judge LeRoi was attempting to ensure that the Plaintiff did not abscond with the subject matter of the lawsuit before Ms. Hill's claims could be heard. But contrary to Judge Hansen's characterization of that order in Exhibit 5, Judge LeRoi's order neither purports to bar Defendant Olt from releasing the horses, nor does it specifically direct that the horses remain in Montezuma County; the order only states that the <u>Plaintiff</u> may not move them from Montezuma County. Given Judge Hansen's misinterpretation of Judge LeRoi's order, her order at Exhibit 5 does not suffice to dispute Defendant Olt's contention that, as prosecutor, he was authorized to release the horses to Defendant Rhea under the guise of securing evidence for the case.

With regard to Judge Hansen's observation that "Presence of the horses is not a requirement of proof in the criminal case," the order is ambiguous. It is not clear whether Judge Hansen is finding that, contrary to Defendant Olt's position here, the horses themselves <u>cannot</u> be used as evidence in the criminal case or whether she is finding that the physical presence of the horses, although perhaps helpful, were not <u>essential</u> to prosecution (or defense). The distinction is meaningful, as Defendant Olt's prosecutorial immunity extends only to his actions to preserve evidence that could be used in the case against the Plaintiff. If the horses could not, under any circumstances, be relevant evidence in the prosecution of the Plaintiff, Defendant Olt's release of them would be more akin to the type of post-trial disposal of seized non-evidentiary property in

23

*Coleman* that falls outside the scope of absolute immunity.  However, if the horses, while not necessarily <u>essential</u> evidence, were even potentially admissible in the prosecution against the Plaintiff, deference to Defendant Olt's proecutorial discretion warrants vesting him with immunity to decide how to safeguard such evidence.

The Court is required to draw all reasonable inferences in favor of the non-movant Plaintiff for purposes of the Defendants' motion for summary judgment.  But even if it were to infer that Judge Hansen's comment in Exhibit 5 reflects her belief that the horses were inadmissible at trial, this evidence alone is insufficient to raise a genuine issue of fact as to whether Defendant Olt is entitled to prosecutorial immunity.  Judge Hansen's comment is apparently dicta, as the motion she was adjudicating at the time was the Defendant's Motion for Return of Horses, not an evidentiary challenge to the admissibility of the horses.  As dicta, her observation as to the admissibility of the horses is neither law of the case, nor an actual evidentiary determination, and thus is insufficient to refute Defendant Olt's testimony that he intended to use the horses as evidence.  Moreover, Exhibit 5 is dated December 18, 2002, six months after the date upon which Defendant Olt released the horses.  In the absence of any other evidence placing Judge Hansen's comments in a temporal context – and the Plaintiff points to none – the jury would be forced to speculate as to whether Judge Hansen's view of the admissibility of the horses in December 2002 is based on the facts as they appeared at that time, or whether she was purporting to find that the horses were clearly inadmissible evidence back in May 2002 when Defendant Olt released them.

Simply put, Exhibit 5 is not, in and of itself, sufficient to raise a genuine issue of material fact as to Defendant Olt's claim of absolute prosecutorial immunity.  Although Judge Hansen's order implies that the facts asserted by Defendant Olt may be inaccurate, close examination of the

order reveals that the order does not directly and actually refute any of Defendant Olt's

contentions.  Because the Plaintiff has not identified any relevant evidence in addition to Exhibit 5,

she has failed to carry her burden to establish a genuine dispute as to any of the facts that underlie

Defendant Olt's claim that he is entitled to absolute prosecutorial immunity.   Accordingly, the

Court finds that Defendant Olt is entitled to absolute immunity for his actions in releasing the

horses to Defendant Rhea.  Moreover, the evidence is undisputed that, in releasing the horses,

Defendants Shoun and Stevenson were acting at the direction of Defendant Olt, and thus, they are

entitled to absolute immunity for actions relating to the release of the horses as well.  *Perez*, 421

F.3d at 1133 (immunity turns on the nature of the act, not the identity of the person performing

it).

Accordingly, Defendants Olt, Shoun, and Stevenson are entitled to judgment on the

Plaintiff's Due Process claim.[18]

### B.  Defendant Rhea

Defendant Rhea moves for summary judgment on the Plaintiff's conversion claim and for

judgment on her own counterclaim of breach of contract against the Plaintiff.  The Plaintiff bears

the burden of proof at trial on the conversion claim, and Defendant Rhea bears the burden of

proof on the breach of contract claim.  Because the conversion claim turns on which party was

entitled to possession of the horses, and the question of possession is driven largely by the terms

of the parties' contract, the Court will address the breach of contract counterclaim first.

---

[18]The Court notes that absolute immunity disposes of the Plaintiff's Due Process claim
against Defendants Olt, Shoun, and Stevenson.  However, it does not necessarily immunize these
Defendants against the Plaintiff's first claim, sounding in malicious prosecution under § 1983.
The Defendants' motions did not separately address this claim, and thus, this claim must proceed
to trial as against these Defendants.

To prove her counterclaim for breach of contract, Defendant Rhea must establish (i) a contract between the parties; (ii) performance or excuse of performance by Defendant Rhea; (iii) non-performance by the Plaintiff; and (iv) damages resulting. *Western Distrib. Co. v. Diodoso*, 841 P.2d 1053, 1057 (Colo. 1992). It is undisputed that the parties' 1994 breeding agreement constitutes a binding contract, and that Defendant Rhea performed the contract by delivering possession of Edes to the Plaintiff. Defendant Rhea cites to evidence that the Plaintiff breached her obligations under the contract in the following respects: (i) by selling or otherwise transferring possession of Edes to the trust, in violation of that portion of the contract that states that the Plaintiff shall not sell or transfer the horse; (ii) by failing to return the horse during time periods in which the Plaintiff was either incarcerated and/or acknowledged having no income or other means to carry out her promise to care for the horse; (iii) by failing to return Edes when the horse was found to be in an unhealthy condition on or about February 7, 2002; (iv) by failing to pay for veterinary bills for the care of Edes; (v) by failing to insure the horse in the amounts called for by the contract; and (vi) by failing to transfer Elgin to Defendant Rhea, pursuant to the contract's requirement that the Plaintiff deliver one foal to be chosen by Defendant Rhea.

In response, the Plaintiff concedes that she transferred Edes to the trust in violation of the contract, but contends that this "technical transfer" did not cause any damage to Defendant Rhea. The Plaintiff also appears to concede that she used Edes as collateral in another transaction, but contends that pledging the horse is not a violation of the parties' contract, and that, if it is, it is not a material breach and Defendant Rhea has not been damaged. The Plaintiff's response to the issue of insurance is to state, apparently inconsistently, that she "had insurance for Edes," and that she "attempted to get insurance for [Edes], was told it could not be obtained due to her age, and

26

communicated that to [Defendant Rhea]." *Docket* # 150 at 8.  In support of this contention, the

Plaintiff cites to Exhibit 30 to her response, which is an insurance policy covering Edes from

September 11, 1996 to September 11, 1997, but provides no other evidence of ongoing insurance

coverage.  The Plaintiff cites to no evidence for the proposition that Edes became uninsurable,

that the Plaintiff communicated this fact to Defendant Rhea, or that Defendant Rhea waived that

requirement of the contract.  The Plaintiff disputes Defendant Rhea's contention that the horses

were found in ill health on February 7, 2002, by, inexplicably, citing the Court to certain

veterinary paperwork dated in May and June 2002, which reported the horses to appear to be

healthy.  Notably, however, the Plaintiff concedes that former Defendant Connor testified that the

horses were in bad condition when he observed them in March 2002, but that they had improved

when he saw them again at the Krehbiels' ranch.  The Plaintiff also points to testimony by Sharon

Vaughn that the horses were healthy throughout the time when they were in the Plaintiff's

possession.  With regard to Defendant Rhea's contention that the Plaintiff breached the contract

by not alerting Defendant Rhea when she became incarcerated or otherwise economically unable

to care for the horses, the Plaintiff states that "[her] incarceration may or may not have rendered

her financially and otherwise unable to care for Edes & Elgin.  But there is no showing it did."

*Docket* # 150 at 10.  She cites to no evidence refuting the evidence of her insolvency cited by

Defendant Rhea.  Regarding the issue of the contractual requirement that the Plaintiff turn over

one foal as selected by Defendant Rhea, the Plaintiff points to evidence that Defendant Rhea

requested a foal sired by a horse named Baron Gyemant, and the undisputed fact that Baron

Gyemant is not the sire of Elgin.

Based on the parties' briefing, the Court finds that Defendant Rhea has established that there is no genuine factual dispute that the Plaintiff breached the contract in several respects. The Plaintiff admittedly transferred the horses to the trust in violation of the contract. The Plaintiff failed to keep the required amount of insurance on Edes. There was a period of time in May 2002 when the Plaintiff attested that she had no income and was effectively insolvent. Her failure to notify Defendant Rhea of this situation constitutes a breach of paragraph 12 of the contract, which states that "If at any time [Plaintiff] is unable, unwilling, or hasn't the means to provide all reasonable maintenance and adequate care for [Edes], she is to return into the possession/be transferred back to [Defendant Rhea]." *Docket #* 140, Ex. 1, ¶ 12. The Plaintiff has not responded to Defendant Rhea's evidence that the Plaintiff failed to pay various expenses incurred to keep Edes healthy, and thus, has breached paragraph 2 of the contract which requires the Plaintiff to pay for all veterinary care for Edes. Accordingly, the Court finds that Defendant Rhea has established that there is no genuine dispute of fact that the Plaintiff has breached the contract in many respects.[19]

The issue regarding Defendant Rhea's right to a foal from Edes is somewhat more complicated. The contract states "[Defendant Rhea] reserve[s] the right to one foal from [Edes] live foal guarantee by either H. Baron Gyemant or Fokus, or another stallion offered by [Plaintiff], choice of stallions at the discretion of [Defendant Rhea]." *Docket #* 140, Ex. 1, ¶ 5. The

---

[19]The contract restricts the Plaintiff's ability to "[sell], transfer[ ], lease[ ], or dispose of [the horse] in any manner," *Docket #* 140, Ex. 1, ¶ 11, but does not expressly prohibit the Plaintiff pledging the horse as collateral, and thus, Defendant Rhea has not established that the Plaintiff's use of Edes as collateral was a violation of the contract. There are disputed issues of fact as to the condition of the horses throughout the time period at issue here, preventing summary judgment on the breach of contract claim in that respect.

evidence is undisputed that Defendant Rhea communicated to the Plaintiff that she wanted Baron Gyemant to be the sire of the foal.  The record is also undisputed that Baron Gyemant never sired a foal from Edes.  The record does not reflect any further discussions by the parties as to the acceptability of a foal sired by Fokus, whether the Plaintiff offered any other stallions, or whether Defendant Rhea chose any offered stallion to sire the foal.  Rather, it appears that the matter was left unresolved until Defendant Rhea took possession of Edes and Elgin in June 2002, at which time Defendant Rhea learned of Elgin's existence and Defendant Rhea immediately and unilaterally "selected" Elgin as the foal covered by the agreement.

The terms of the contract on the issue of which horse may sire Defendant Rhea's foal are ambiguous.  By the terms of the contract, Defendant Rhea could select any foal born to Edes and sired by Baron Gyemant or Fokus, but there is no evidence that any foal matching that description exists.  In the absence of such a foal, the contract becomes ambiguous, noting that the sire would be a stallion "offered by" the Plaintiff, but that the stallion[20] would be chosen by Defendant Rhea. The term "offered" in this context is ambiguous.  On the one hand, it could be used as a synonym for "selected," in the sense that it allows the Plaintiff to select one or more stallions that she will offer as potential sires for Edes' foal, and Defendant Rhea would chose from the selected stallions.  On the other hand, "offered" could be used in the sense of "had available," allowing Defendant Rhea to select the stallion from all of the stallions the Plaintiff kept and made available

---

[20]Throughout the briefing of this matter, Defendant Rhea frequently characterizes the contract as allowing her the right to select a foal.   Importantly, the terms of the contract vest in Defendant Rhea selection of the stallion that would sire the foal.  The contract does not expressly state that Defendant Rhea would have the ability to select a particular foal.

commercially for breeding purposes.  Because the contract is ambiguous, the Court cannot grant summary judgment to either party on the question of who is entitled to possess Elgin.

Although the Court has found that the Plaintiff breached the contract is some respects, Defendant Rhea is not entitled to summary judgment on her counterclaim.  As stated previously, an element of the claim of breach of contract is that the breach damaged the claimant, and in order to enter summary judgment in Defendant Rhea's favor, the Court must find that the amount of damages to be awarded is not subject to genuine factual dispute.  In this regard, Defendant Rhea has failed to establish that absence of a genuine issue of fact with regard to the damages sustained as a result of the breaches found by the Court.  In support of her motion, Defendant Rhea lists various items of damages, but does not clearly identify which damages were sustained as a result of which actions by the Plaintiff, nor establish the amount of damages with evidence.  For example, Defendant Rhea identifies "veterinary bills for [Edes] and [Elgin]" as amounting to approximately $ 1,000 in damages.  *Docket* # 138 at 11.  Because the Court has denied summary judgment on Defendant Rhea's counterclaim involving Elgin, there is a dispute of fact as to the amount of veterinary bills for Edes alone.  Moreover, Defendant Rhea has not come forward with evidence establishing the amounts of damages.  She cites to "Rule 26(a)(1) Disclosures" as her only evidentiary support for her damage claims, but does not attach copies of those disclosures to the motion.[21]

---

[21]Even assuming Defendant Rhea had attached the copies, the Court has some doubt that Rule 26(a)(1) disclosures are sufficient evidence upon which to grant summary judgment. Pursuant to Fed. R. Civ. P. 26(g)(1), Rule 26(a)(1) disclosures need only be signed by a party's attorney, and reflect that the disclosures reflect the <u>attorney's</u> knowledge and belief as to the contents of the disclosures.

Accordingly, because Defendant Rhea has not come forward with facts that establish all of the elements of her breach of contract counterclaim, the Court declines to grant summary judgment on Defendant Rhea's counterclaim for breach of contract.  However, because the Court has found a lack of factual dispute as to many of the Plaintiff's breaches of the agreement, the Court will bifurcate trial of liability and damages on the breach of contract counterclaim as follows: Defendant Rhea has established that there is no genuine dispute of fact as to the Plaintiff's liability for breaching the contract by transferring ownership of the horses to the trust, by not maintaining proper insurance, by not advising Defendant Rhea of the Plaintiff's insolvency in May 2002, and by failing to pay veterinary bills.  The Court will treat these breaches as established, and the jury will be asked only to determine the amount of damages resulting from these breaches.  There are genuine factual disputes as to the Plaintiff's liability for other breaches alleged by Defendant Rhea, such as the Plaintiff's failure to keep the horses in good condition and the Plaintiff's refusal to deliver Elgin as the foal described in the agreement.  The jury will be asked to determine both the liability of the Plaintiff for these alleged breaches and, if necessary, the amount of resulting damages to Defendant Rhea.

Turning to the Plaintiff's conversion claim, Defendant Rhea contends that the Plaintiff cannot establish all the elements of the claim, and that Defendant Rhea is therefore entitled to summary judgment.  To prove a claim of conversion, the Plaintiff must establish that Defendant Rhea (i) engaged in an act of dominion or control, (ii) over property in which the Plaintiff had a superior right of control, and (iii) did so without the Plaintiff's authorization.  *See e.g. Dorris v. San Luis Valley Finance Co.*, 7 P.2d 407, 408-09 (Colo. 1932); *see also Restatement (Second), Torts*, § 222A ("Conversion is an intentional exercise of dominion or control over a chattel which

so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel").  Defendant Rhea challenges the Plaintiff's ability to establish the second and third elements of this claim.

With regard to Edes, the foregoing discussion establishes that the Plaintiff was in breach of the parties' contract in several respects as of June 2002.  Most significantly, in May 2002, the Plaintiff acknowledged a lack of income or liquid assets that called into doubt her ability to provide for the care and maintenance of Edes.  Under the terms of paragraph 12 of the parties' contract, it then became the Plaintiff's obligation to return possession of Edes back to Defendant Rhea.  *Docket* # 140, Ex. 1, ¶ 12.  At this point in time, the Plaintiff's right to control Edes became inferior to Defendant Rhea's right to control of the horse, making it impossible for Defendant Rhea to convert Edes from the Plaintiff.  As an separate and independent matter, the numerous other breaches of the contract by the Plaintiff gave rise to Defendant Rhea's right to either disaffirm the contract and decline to perform her own obligations – including the obligation to permit the Plaintiff to retain possession of Edes – or may affirm the contract and sue for damages or specific performance.  *Shotkoski v. Denver Investment Group, Inc.*, ___ P.3d ___, 2006 WL 408313 (Colo. App. Feb. 23, 2006).   By retaking possession of Edes, Defendant Rhea was acting within her legal rights to rescind the contract, and, in such circumstances, her right to control Edes thereafter was superior to the Plaintiff's right of possession, which derived solely from the since-rescinded contract.  Thus, Defendant Rhea is entitled to summary judgment on the Plaintiff's conversion claim involving Edes.

The situation is different with Elgin.  As the foregoing discussion indicates, there is a genuine issue of material fact as to whether Defendant Rhea was entitled to Elgin as the foal

specified by the terms of the contract.  If it is ultimately found by the trier of fact that Defendant

Rhea was entitled to Elgin as the foal in the contract, the Plaintiff's conversion claim concerning

Elgin must fall.  However, if the finder of fact concludes that Defendant Rhea did not have the

right, whether contractual or otherwise,[22] to continued possession of Elgin, the Plaintiff's

conversion claim would properly lie.  Accordingly, Defendant Rhea is not entitled to summary

judgment on the Plaintiff's claim for conversion as it relates to Elgin.

### C.  Plaintiff's Motion for Summary Judgment

The Court declines to consider the Plaintiff's motion for summary judgment.  The Court's

Practice Standards set forth specific formatting requirements for such motions to ensure that the

claims upon which judgment is sought and the allegedly undisputed facts underlying such claims

are set forth clearly.  The Plaintiff's motion fails to comply with this format, placing an undue

analytical burden on the Court to suss out the Plaintiff's intentions and arguments.  Moreover, the

organization of the Plaintiff's motion is so jumbled and oblique that any effort at untangling and

deciphering the Plaintiff's contentions would consume an unreasonable amount of the Court's

resources.  In any event, the Court has already granted dismissal or summary judgment to

Defendants Olt, Shoun, and Stevenson on all but the malicious prosecution claim, and has found

issues of fact with regard to the Plaintiff's conversion claim against Defendant Rhea and

Defendant Rhea's breach of contract counterclaim.  The Court's cursory review of the Plaintiff's

---

[22]Assuming Defendant Rhea does not establish a contractual right to possession of Elgin, an argument could be made that she nevertheless had the right in June 2002 to possess the horse, based on her contractual agreement with Defendant Olt to preserve the horses as evidence for trial.  However, any right to possession founded on this argument likely terminated when Defendant Olt requested that Defendant Rhea return the horses in 2003, and Defendant Rhea apparently refused.

summary judgment motion finds that there appear to be material factual disputes in all of the remaining claims.  Accordingly, the Plaintiff's motion for summary judgment is denied.

### D.  Motions to Seal

Each Defendant has moved to seal portions of their summary judgment motions – and in the case of Defendant Rhea, the entirety of her motion and all accompanying exhibits – pursuant to the Magistrate Judge's Protective Order **(# 87)**.  That order provides that "Any deposition of Ms. Vaughn must remain sealed and will only be accessible by counsel of record in this case and no one else.  The deposition shall remain sealed unless and until the Court directs otherwise." The order also provides that "Answers to written discovery will remain in the custody of counsel only."

The Supreme Court acknowledged a common-law right of access to judicial records in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978).  This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system.  *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002).  Judges have a responsibility to avoid secrecy in court proceedings because "secret court proceedings are anathema to a free society."  *M.M. v. Zavaras*, 939 F. Supp. 799, 801 (D. Colo. 1996).

There is a presumption that documents essential to the judicial process are to be available to the public, but they may be sealed when the public's right of access is outweighed by interests which favor nondisclosure.  *See United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997). It is within the district court's discretion to determine whether a particular court document should be sealed.  *See Nixon,* 435 U.S at 599.  However, only in the rarest of cases is the sealing of documents appropriate – for example, cases involving intensely personal issues such as abortion

34

or birth control, or cases pertaining to the welfare of abandoned or illegitimate children. *See Doe v. F.B.I.*, 218 F.R.D. 256, 259 (D. Colo. 2003). This District's rules require that records be sealed only upon a showing of "compelling" reasons. D.C. Colo. L. Civ. R. 7.2. Such a showing is required to ensure public confidence in the judicial process. It is critical that the public be able to review the factual basis of this Court's decisions and evaluate the Court's rationale so that it may be confident that the Court is functioning as a neutral arbiter. *Cf. McVeigh*, 119 F.3d at 814.

Here, the Magistrate Judge's protective order was issued in response to a May 31, 2005 motion by the Plaintiff **(# 73)** that cited the pendency of "charges" against her in El Paso County, and the need to ensure that the Plaintiff's discovery responses in this case do not compromise her 5th Amendment rights in that proceeding. Although the parties have not stated that the El Paso County charges are still pending, this Court will nevertheless continue the operation of the Magistrate Judge's protective order. However, in light of the public's right of access to the files in this case, the Court will apply the Magistrate Judge's ruling narrowly, such that only the Plaintiff's deposition and written discovery responses shall be subject to seal. Defendants Olt, Shoun, and Stevenson's motions to seal conform to the narrow scope of the Magistrate Judge's protective order, and thus, will be granted. Defendant Rhea's motion does not. Nothing in the record warrants the sealing of Defendant Rhea's motion papers, nor anything other than Exhibit A2, which is the Plaintiff's deposition transcript. Accordingly, Defendant Rhea's motion to seal will be granted in part, insofar as Exhibit A2 to her summary judgment motion will remain sealed, and denied in part, insofar as the remainder of that motion and its exhibits will be unsealed.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Leave to File an Amended Complaint (**# 126**) is **DENIED**.  The Plaintiff's Motion for Partial Summary Judgment (**# 128**) is **DENIED**. Defendants Shoun and Stevenson's Motion to Dismiss (**# 129**) is **GRANTED**, and the Plaintiff's conversion and replevin claims against Defendants Shoun and Stevenson are dismissed as untimely.  Defendant Olt's Motion to Seal (**# 130**) is **GRANTED**, and the exhibit filed by Defendant Olt under seal shall remain sealed.  Defendants Shoun and Stevenson's Motion for Summary Judgment (**# 132**) is **GRANTED**, and judgment shall enter in favor of Defendants Shoun and Stevenson on the Plaintiff's Due Process claim against them.  Defendants Shoun and Stevenson's Motion to Seal (**# 134**) is **GRANTED**, and the exhibit filed by them under seal shall remain sealed.  Defendant Olt's Motion for Summary Judgment (**# 135**) is **GRANTED**, and judgment shall entered in favor of Defendant Olt on the Plaintiff's Due Process claim against him. Defendant Rhea's Motion to Seal (**# 137**) is **GRANTED IN PART**, insofar as Exhibit A2 to Defendant Rhea's summary judgment motion (**# 138**) shall remain sealed, and **DENIED IN PART**, insofar as the Clerk of the Court shall unseal all other filings at Docket # 138.  Defendant Rhea's Motion for Partial Summary Judgment (**# 138, 161**) is **DENIED IN PART**, insofar as judgment shall not enter on either Defendant Rhea's breach of contract counterclaim or the Plaintiff's conversion claim, and **GRANTED IN PART**, insofar as the Court will bifurcate the issues of liability and damages in Defendant Rhea's breach of contract counterclaim, and will treat the various breaches described above as established for purposes of liability.  Defendant Rhea's Motion to Strike (**# 177**) the Plaintiff's Second Supplemental Response (**# 173**) is **GRANTED**, and that document is **STRICKEN**.  The Plaintiff's Motion for Extension of Time (**# 181**) to file a response to Defendant Rhea's Motion to Strike is **DENIED AS MOOT**.

36

The matters remaining for trial are:

1. the Plaintiff's malicious prosecution claim against all Defendants;

2. the Plaintiff's Due Process claim against Defendant Rhea;

3. the Plaintiff's conversion and replevin claims against Defendant Rhea with regard to Elgin only;

4. the damages resulting to Defendant Rhea from the Plaintiff's breach of the contract by transferring ownership of the horses to the trust; by failing to carry the required amount of insurance; by failing to advise Defendant Rhea of the Plaintiff's insolvency in May 2002; and by failing to pay veterinary bills;

5. the liability of the Plaintiff for breach of the contract by allegedly failing to keep the horses in healthy condition and by failing to deliver Elgin to Defendant Rhea as the foal designated by the contract, and, if the Plaintiff is so liable, the amount of damages resulting to Defendant Rhea; and

6. Defendant Rhea's counterclaims for negligent misrepresentation, negligence, and violation of C.R.S. § 35-54-101 *et seq.*

Dated this 30th day of May, 2006

BY THE COURT:

_Marcia S. Krieger_
_____

Marcia S. Krieger
United States District Judge

37